OPINION BY BRIAN JACK GOREE, VICE-CHIEF JUDGE:
¶ 1 The State filed its petition to adjudicate children deprived and to immediately seek termination of mother's parental rights due to mother's failure to protect her children from heinous and shocking sexual abuse by the father. The record on appeal contains clear and convincing evidence that the mother failed to take reasonable action to prevent the abuse, including agreeing to withdraw the protective order and to the father's unsupervised visitation of the children. Further, the jury trial held two years after the removal of the children in violation of 10A O.S. § 1-4-601 did not violate the due process clauses of the United States or Oklahoma Constitutions because the mother had a meaningful and fair opportunity to defend, and the risk of erroneous deprivation posed by the procedure employed by the trial court is outweighed by the risk of substantial harm to the children.
I. FACTS AND PROCEDURAL BACKGROUND
¶ 2 Amber Hensley (Mother) appeals the trial court order adjudicating her children, E.H. and J.H., deprived and terminating her parental rights pursuant to 10A O.S. § 1-4-904(B)(9). We affirm the trial court's order.
¶ 3 In August 2015, E.H. disclosed to Mother that her father was sexually abusing her. After the disclosure, Mother sought the assistance of medical personnel, police, DHS and other social service organizations for counseling and parenting classes. At the time of the initial disclosure, E.H. did not have a medical exam. In September 2015, Mother filed for an emergency protective order from the father. Later that month, DHS ruled out the threat of harm due to Mother's securing a protective order. In November 2015, the father filed a paternity petition. In December 2015, Mother and father appeared for the hearing on the protective order and paternity petition. At the hearing, the judge directed the parties to speak with one other. While discussing whether the parties could reach an agreement in a separate room from the courtroom, Mother allowed her children to be around the father and allowed them to sit on his lap. After this discussion, the parties reached an agreement and the court entered its order dissolving the protective order, providing unsupervised visitation for the father, and setting an amount for child support. Around Christmas time 2015, after Mother withdrew the protective order, the father had visitation with the children.
¶ 4 In March 2016, DHS received a new referral regarding abuse of E.H. and J.H. from a disciplinary/spanking incident by Mother. The DHS worker conducted an investigation and interviewed E.H. and Mother. E.H. disclosed to the DHS worker that Mother hit her with a belt and hanger, and that father sexually abused her and her sister. Mother disclosed to the DHS worker several things, including that the children had seen the father the day before, that E.H. had disclosed sexual abuse, that the children were acting out in a sexual manner, and that E.H. could describe father's sexual anatomy. On March 7, 2016, a forensic interviewer spoke with E.H. At the interview, E.H. made disclosures regarding the sexual abuse by the father as to both E.H. and J.H. When asked if E.H. told Mother, E.H. replied that Mother told her "[d]addies just do that sometimes.
*1007 All daddies put their fingers in there." On March 8, 2016, a nurse conducted a sexual assault examination of E.H. and J.H. The nurse found E.H. had injuries consistent with sexual abuse. The nurse examined J.H. but found no physical findings. That same day, E.H. and J.H. were removed by DHS by way of a Temporary Emergency Custody Order. A show cause hearing was held on March 9, 2016.
¶ 5 On March 23, 2016, the State of Oklahoma (State) filed a petition alleging E.H. and J.H. to be deprived children as to their mother and sought immediate termination of Mother's parental rights to both children due to shocking and heinous neglect or abuse. The State alleged the natural father sexually abused the children, Mother knew the children were sexually abused by the father and others, and Mother permitted the father to have unsupervised visitation in exchange for monthly support.
II. STANDARD OF REVIEW
¶ 6 On review Mother raises two propositions of error. First, the State failed to meet its burden of proof that she failed to protect her children from abuse or neglect. Second, the trial court's failure to set an adjudication hearing within the time limits prescribed by 10A O.S. § 1-4-601 violated mother's due process of law.
¶ 7 Before a state may sever the rights of parents to their natural child, the State must support its allegations at trial by clear and convincing evidence. In re S.B.C. , 2002 OK 83, ¶ 5, 64 P.3d 1080, 1082 citing Santosky v. Kramer , 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). On review, we apply the same standard used in the district court. Id. ¶ 7. Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established. In re K.C. , 2002 OK CIV APP 58, ¶ 5, 46 P.3d 1289. This standard balances the fundamental rights of parents with the State's duty to protect children within its borders. Id. In the absence of sufficient evidence that the State met its burden clearly and convincingly, an order terminating parental rights will be reversed on appeal. Id.
¶ 8 In determining whether there was a constitutional deprivation of due process, we review the timing of the trial court's adjudication hearing de novo . See In re A.M. , 2000 OK 82, ¶ 6, 13 P.3d 484, 486-87 (claims that a procedure used in a parental rights termination proceeding violated due process are reviewed de novo ). De novo review requires an independent, non-deferential re-examination of another tribunal's legal rulings. Id.
III. ANALYSIS
¶ 9 First, Mother argues the jury's determination that she failed to protect E.H. and J.H. from heinous and shocking abuse is not supported by clear and convincing evidence. Mother actually argues the evidence at trial demonstrated she took reasonable action after E.H. disclosed the abuse. Mother also asserts that there was no evidence introduced at trial that the father sexually abused the children after the court ordered him visitation.
¶ 10 In regard to this case, a trial court may not terminate parental rights of a parent to a child unless the child has been adjudicated deprived, termination of parental rights is in the best interest of the child, and a "finding that the parent ... failed to protect the child or a sibling of the child from abuse or neglect that is heinous or shocking." 10A O.S. § 1-4-904(B)(9)" 'Failure to protect' means failure to take reasonable action to ... prevent child abuse or neglect, and includes the conduct of a non-abusing parent ... who knows the identity of the abuser ..., but ... fails ... to take reasonable action to end the abuse or neglect." 10A O.S. § 1-1-105(26).
¶ 11 While Mother did initially take action by seeking the help of medical professionals, police and DHS, she failed to protect her children when she agreed to withdraw the protective order and give the father unsupervised visitation in exchange for monthly child support. Further, there was evidence introduced at trial that the father had sexually abused the children after visitation was *1008 granted. Mother testified she wrote social media posts stating she "granted him every other weekend with his kids unsupervised" and that she was "giv[ing] [the father] one last chance to be a part of their life."
¶ 12 Rebecca Williamson, a sexual assault nurse, testified she performed an examination of E.H. and J.H. Williamson testified E.H. had injuries consistent with sexual assault. E.H. told the nurse that "Mommy said don't talk about this stuff or Daddy will go to jail." E.H. said they had seen their daddy a couple days before the physical examination.
¶ 13 Lyndsey Stephens, a DHS permanency planning worker, testified that while the children were in their foster home placement, she visited them at least once a month and that they are doing very well. At the beginning of the placement, the children exhibited behavioral issues, but those have since subsided. Stephens testified that she kept in touch with Mother during this time and that she was aware Mother was taking classes, but was still concerned when Mother could not verbalize how to protect the girls at home should she get into another relationship. Stephens testified that the children last referred to their biological mother in November 2016 and referred to her as "fake Mom." They refer to their foster parents as "Mommy" and "Daddy." Stephens testified the girls are treated as if they were the foster parents' biological children; they are well cared for and do not want to leave their foster home.
¶ 14 In parental rights termination proceedings, the State has the burden of proof. This summary of the evidence indicates the State met its burden of proving by clear and convincing evidence Mother failed to protect her children from heinous and shocking sexual abuse and that termination of Mother's parental rights was in the best interests of the children.
¶ 15 Mother's next assignment of error is that the two-year delay in the adjudication hearing violated her due process rights guaranteed by the U.S. and Oklahoma Constitutions. Mother argues the trial court erred in not holding an adjudication hearing within the time limits mandated by statute.
¶ 16 10A O.S. § 1-4-601 provides in pertinent part:
A. The court shall hold an adjudication hearing following the filing of a petition alleging that a child is deprived. The hearing shall be held not more than ninety (90) calendar days following the filing of the petition. The child and the child's parents, guardian, or other legal custodian shall be entitled to not less than twenty (20) days' prior notice of the hearing.
B. 1. The child shall be released from emergency custody in the event the adjudication hearing is delayed beyond ninety (90) days from the date the petition is filed unless the court issues a written order with findings of fact supporting a determination that:
a. there exists a reasonable suspicion that the health, safety, or welfare of the child would be in imminent danger if the child were returned to the home, and
b. there exists either an exceptional circumstance to support the continuance of the child in emergency custody or the parties and the guardian ad litem, if any, agree to such continuance.
2. If the adjudicatory hearing is delayed pursuant to this subsection, the emergency custody order shall expire unless the hearing on the merits of the petition is held within one hundred eighty (180) days after the actual removal of the child.
¶ 17 The State filed its petition to adjudicate E.H. and J.H. as deprived and to immediately terminate mother's parental rights on March 23, 2016. Ninety days after the filing of the petition was June 21, 2016. By that date, there had not been an adjudication hearing or a written order issued pursuant to § 1-4-601(B)(1). By operation of law, the emergency custody order expired 180 days after the children were removed from Mother's custody, or on September 4, 2016. On October 31, 2016, Mother filed a Motion for Visitation and a Motion to Dismiss the Emergency Custody Order or alternatively requested the matter be set for a hearing on the merits. In the Motion to Dismiss, she cited § 1-4-601(B)(2) and argued the order expired by operation of law. On December 1, 2016, the trial court denied both of Mother's *1009 motions. Between December 2016 and March 2018, from the record, it appears the court conducted several disposition or review hearings and set the matter for jury trial at least twice. The jury trial to adjudicate the children deprived and terminate mother's parental rights was finally held March 13-14, 2018, two years after the children were removed from Mother's custody.
¶ 18 Due process is implicated in a parental rights termination proceeding. In re A.M., 2000 OK 82, ¶ 6, 13 P.3d 484. Mother cites Okla. Const. art. 2, § 7 in support of her argument. Section 7 provides "[n]o person shall be deprived of life, liberty, or property, without due process of law." Before a deprivation can occur, due process requires a meaningful opportunity to be heard. Flandermeyer v. Bonner , 2006 OK 87, ¶ 10, 152 P.3d 195. Due process is flexible and calls for such procedural protections as the particular situation demands. Id. citing Wood v. Indep. Sch. Dist. No. 141 of Pott. Co. , 1983 OK 30 ¶ 17, 661 P.2d 892. Before Mother's due process rights are violated, it must be shown that the action was arbitrary, oppressive and shocking to the conscience of the court. Id . citing Meadows v. Meadows , 1980 OK 158, ¶ 7, 619 P.2d 598. The passage of time alone does not establish an unconstitutional delay or a violation of due process. Simpson v. State , 1982 OK CR 35, ¶ 6, 642 P.2d 272.
¶ 19 In determining whether an individual has been denied procedural due process we engage in a two-step inquiry, asking whether the individual possessed a protected interest to which due process protection applies and if so, whether the individual was afforded an appropriate level of process. In re A.M., 2000 OK 82, ¶ 7, 13 P.3d 484, 487 citing Daniels v. Williams , 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) ; U.S. Const. amend. XIV, § 1 ; Okla. Const., art. 2 § 7.
¶ 20 In the context of a proceeding to terminate parental rights, the answer to the first inquiry is clear. Parents have a constitutionally protected liberty interest in the continuity of the legal bond with their children. Id. at ¶ 8, citing In re Delaney , 1980 OK 140, 617 P.2d 886 ; In re Christina T ., 1979 OK 9, 590 P.2d 189. The fundamental nature of parental rights requires that the full panoply of procedural safeguards must be applied to child deprivation hearings. Id. citing In re Chad , 1978 OK 94, 580 P.2d 983, 985.
¶ 21 The answer to the second inquiry, however, must be determined on a case-by-case basis because the due process clause does not by itself mandate any particular form of procedure. It calls for such procedural protection as the particular situation demands. Id. at ¶ 9. In the context of a proceeding to terminate parental rights, the essence of procedural due process is a "meaningful and fair opportunity to defend." Id. In assessing whether Mother was afforded an appropriate level of process, three factors are used. See id. at ¶ 10. A court must consider the private interest affected by the state's action, the risk of erroneous deprivation posed by the procedures employed, and the probable value, if any, that additional or substitute procedures would provide and the governmental interest at stake. Id.
¶ 22 In this case, the procedure employed by the court was the delay in the adjudication hearing. The trial court clearly violated § 1-4-601 when it did not conduct a hearing within 90 days or otherwise comply with § 1-4-601. Mandatory language is used in the statute; it is clear the legislature intended the hearing to be held within a certain time frame.
¶ 23 In determining whether there was a deprivation of Mother's rights, it is helpful to review legislative intent with regard to the Oklahoma Children's Code. We presume it is in a child's best interest to be in the custody of their natural parents; however, this presumption is overcome when there is evidence of abuse, neglect or threat of harm to a child in their parents' care. 10A O.S. § 1-1-102(A)(1). Where a child is alleged to be deprived, the State is to only intervene when necessary and to rehabilitate and reunite the family, if possible. See 10A O.S. §§ 1-1-102(B)(1)-(8). When rehabilitation and reunification are not possible, the goal is to place the child in an adoptive home or other permanent *1010 living arrangement. Id. at 1-1-102(B)(7).
¶ 24 Where families can be rehabilitated after a child has been adjudicated deprived, § 1-4-704 requires DHS to prepare an individualized service plan for parents to complete in an effort to regain custody of their children. 10A O.S. § 1-4-704. While some families can be rehabilitated, certain abuse may warrant immediate termination of the parents' rights. See 10A O.S. § 1-4-904(A)(1). Adjudication of a child as deprived can occur concurrently with a proceeding to terminate parental rights. Id. Where the state files a petition alleging a child is deprived and also immediately requests termination of parental rights, the parent is entitled to a jury trial in which the court determines if the child should be adjudicated deprived and the jury determines if the parental rights should be terminated. 10A O.S. § 1-4-502(1). In the case at hand, the State filed a petition alleging E.H. and J.H. were deprived and also sought to terminate Mother's parental rights. A parent's interest in a timely adjudication hearing is heightened when the facts offered to prove a child is deprived are capable of correction. In this case, the State requested termination in its petition based on allegations of failure to protect from heinous and shocking sexual abuse. The risk of an erroneous deprivation posed by the procedure employed by the trial court is outweighed by the risk of substantial harm to the children involved.
¶ 25 While the delay in the adjudication hearing violates the statute, we find no due process violation occurred given Mother had a meaningful and fair opportunity to defend. Cf. In re Christina T ., 1979 OK 9, ¶¶ 9-10, 590 P.2d 189 (the father's due process rights were violated when the trial court entered summary judgment against him and did not provide him a meaningful opportunity to be heard). Due process requires an orderly proceeding adapted to the case in which the parties have an opportunity to be heard, and to defend, enforce and protect their rights. Malone v. Malone , 1979 OK 21, ¶ 4, 591 P.2d 296. On March 13 and 14, 2018, Mother was represented by counsel at the jury trial. She had the opportunity to cross-examine the State's witnesses, as well as put on her case in chief.
¶ 26 In addition to Mother's presence and participation at the jury trial, we note the trial court did not lose jurisdiction when the emergency custody order expired. 10A O.S. § 1-4-601(C). See also In re C.R.G. , 2012 OK CIV APP 52, ¶ 16, 276 P.3d 1114. Subsection (C) provides:
The release of a child from emergency custody due to the failure of an adjudication hearing being held within the time frame prescribed by this section shall not deprive the court of jurisdiction over the child and the parties or authority to enter temporary orders the court deems necessary to provide for the health, safety, and welfare of the child pending the hearing on the petition.
10A O.S. § 1-4-601(C).
¶ 27 The legislature intended that the best interest of the children be the paramount consideration in all proceedings under the Oklahoma Children's Code. 10A O.S. § 1-1-102(E). Furthermore, "[n]othing contained in the [code] shall prevent a court from immediately assuming custody of a child and ordering whatever action may be necessary, including medical or behavior health treatment, to protect the child's health, safety, or welfare." 10A O.S. § 1-4-207.
¶ 28 Between December 1, 2016, the date the court denied Mother's Motion to Dismiss, and March 13-14, 2018, the time when the adjudication hearing and jury trial occurred, it appears from the record that the trial court conducted several review hearings with court minute entries stating the children were to remain in DHS custody.
¶ 29 While the trial court failed to conduct the adjudication hearing within the time proscribed by § 1-4-601, the court did maintain jurisdiction of the matter and the delay in the adjudication hearing did not violate mother's constitutional guarantee of due process of law.
¶ 30 AFFIRMED.
SWINTON, P.J., and MITCHELL, J. concur.